IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | 8:09CR400 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | SENTENCING MEMORANDUM |
| | ) | |
| JUAN ORTEGA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court for sentencing. This memorandum opinion supplements findings made on the record at a sentencing hearing on April 29, 2010.

## I. FACTS

The defendant was charged with two counts of knowingly and intentionally distributing a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § Section 841(a) and (b)(1). Filing No. 1, Indictment. Ortega entered a plea of guilty to both counts. Filing No. 21, Minute entry. There is no plea agreement in this case. The court accepted Ortega's plea of guilty and ordered the preparation of the Presentence Investigation Report ("PSR") by the United States Office of Probation ("the Probation Office") that calculated Ortega's sentence under the United States Sentencing Guidelines ("the Guidelines"). Filing No. 32, PSR (Sealed).

In the PSR, the Probation Office based its outline of the offense conduct on the prosecutor's version of events. *Id.* at 3. On two separate occasions in April 2009, Mr. Ortega sold small amounts of methamphetamine (6.9 grams of 40% pure methamphetamine and 5.7 grams of 45% pure methamphetamine) to a cooperating

witness. *Id.* at 3. Laboratory analysis showed the total mixture contained 4.06 grams of actual methamphetamine. *Id.* The quantity determination was based on the finding that:

> The defendant sold 6.9 grams (with a 40% purity rate) on April 16, 2009, and 5.7 grams with a 45% purity rate) on April 30, 2009, to a confidential informant. All drug quantities and purity levels were tested by the Eastern Nebraska Forensic Lab, which has established a margin of error of +/- 10%.

*Id.* at 4. The probation office found that "[c]omputing the 'actual' meth of the two sales results in 5.32 grams actual, but Eastern Nebraska Forensic Lab agrees to a margin of error of +/- 10%." *Id.* Adjusting for the margin of error, the Probation Office determined that U.S.S.G. § 2D1.1(a)(5)(c)(8) provides a base offense level of 24 for an offense involving possession with intent to distribute between 4 and 5 grams of actual methamphetamine. *Id.* at 5. After subtracting three levels for his acceptance of responsibility under U.S.S.G. § 3E1.1, the Probation Office determined that Ortega's total offense level under the Guidelines was 21. *Id.* at 5. Ortega was assessed eight criminal history points for convictions for several drug and drug-paraphernalia possession offenses, negligent minor care and theft by unlawful taking, resulting in a criminal history category of IV. *Id.* at 8. At offense level 21 and criminal history category IV, Ortega's Guidelines range of imprisonment is 57 to 71months. *Id.* at 12.

The government adopted the findings in the PSR. Filing No. 23. The defendant objected to the PSR. Filing No. 26. At the sentencing hearing, Ortega objected to the weight  calculation in the PSR and moved for a sentence outside the Guidelines range. He first argued that the calculations of the weight of actual methamphetamine in the PSR were incorrect and also argued that he should be sentenced under the Guidelines for a mixture of methamphetamine, as opposed to actual methamphetamine, resulting in a base

offense level of 18 rather than 24 and a resulting sentencing range of 30 to 37 months. He argued that he was not a mid-level dealer, but a user who occasionally sold to support his habit. The government acknowledged at the sentencing hearing that the purity of most methamphetamine on the street now is 40%-50% and that it is now uncommon to find methamphetamine of a low level of purity being sold.

Mr. Ortega is presently 31 years old. Filing No. 32, PSR at 9. He was born in Mexico, but has been living in Omaha, Nebraska since 1994 and obtained legal resident status in approximately 1998. *Id.* He is divorced and has one child. *Id.* at 10. He first used alcohol at the age of 20, and drinks infrequently. *Id.* He first used marijuana at the age of 18, and reported daily use. *Id.* at 11. He began using methamphetamine daily in 2005 and last used the drug on the day he was arrested. *Id.* Ortega stated that he believes he has a drug problem and would benefit from participation in a substance abuse treatment program. *Id.*

## II. DISCUSSION

### A. Law

The Sentencing Guidelines are no longer mandatory and the range of choice in sentencing dictated by the facts of the case has been significantly broadened. *Gall v. United States,* 552 U.S. 38, 59 (2007); *Kimbrough v. United States,* 552 U.S. 85, 101 (2007); *Rita v. United States,* 551 U.S. 338, 349-50 (2007); *Cunningham v. California,* 549 U.S. 270, 286-87 (2007); *United States v. Booker,* 543 U.S. 220, 260-61 (2005). District courts must "give respectful consideration to the Guidelines," but are permitted "'to tailor the sentence in light of other statutory concerns as well.'" *Kimbrough*, 552 U.S. at 101 (quoting *Booker,* 543 U.S. at 245-246). These cases "mean that the district court is free

to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough,* 552 U.S. at 113 (Scalia, J., concurring); *Spears v. United States,* 129 S. Ct. 840, 843 (2009) (per curiam) (clarifying that "district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines"); *United States v. O'Connor,* 567 F.3d 395, 398, n.4 (8th Cir. 2009) (assuming without deciding that *Kimbrough's* holding extends beyond the crack-cocaine Guidelines).

In imposing a sentence, the district court must consider the factors set out in the Sentencing Reform Act at 18 U.S.C. § 3553(a).[1] *Nelson v. United States,* 129 S. Ct. 890, 891-92 (2009) (stating that "[t]he sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter"). The statute "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to

---

[1]Those factors are:
(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)   the need for the sentence imposed-
    (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment or the offense;
    (B)   to afford adequate deterrence to criminal conduct;
    (C)   to protect the public from further crimes of the defendant; and
    (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3)   the kinds of sentences available;
(4)   the advisory guideline range;
(5)   any pertinent policy statements issued by the Sentencing Commission;
(6)   the need to avoid unwarranted sentence disparities; and
(7)   the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

accomplish the goals of sentencing." *Kimbrough,* 552 U.S. at 101 (quoting 18 U.S.C. § 3553(a)).

Although the Guidelines remain "the starting point and the initial benchmark" in determining a sentence, they are not the only consideration. *Gall,* 552 U.S. at 49. The district court "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented." *Id.* at 50; *Nelson,* 129 S. Ct. at 892 ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis in original). The Supreme Court rejects the notion that "'extraordinary' circumstances [are required] to justify a sentence outside the Guidelines range" and rejects "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* at 49.

When operating within its characteristic institutional role, which is "to formulate and constantly refine national sentencing standards," the Sentencing Commission has a capacity courts can use in order to base determinations on empirical data and national experience, guided by professional staff with appropriate expertise. *Kimbrough,* 552 U.S. at 109. For the most part, in formulating the Guidelines, the Commission developed and used data on past practices and recidivism. *See* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 72-73 (November 2004), accessed at http:// www.ussc.gov/ 15_ year/ 15_ year_ study_ full.pdf ("Fifteen-Year Assessment"); U.S.S.G. § 1A.1, intro. comment., pt. A, ¶ 3; *Kimbrough,* 552 U.S. at 96; *Gall,* 552 U.S. at 46 (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing

decisions"). Based on sentencing statistics, the Commission established the offense levels for each crime, linked to a recommended imprisonment range. Fifteen-Year Assessment at 14. Accordingly, in many cases the Guidelines represent a reasonable estimation of a fair sentencing range. *See Kimbrough,* 552 U.S. at 109.

When Guidelines are not the result of "the Commission's exercise of its characteristic institutional role," such as when they are not based on any identified empirical approach, but are instead keyed to or guided by statutory directives, a court is not presented with the "ordinary case," in which "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* (quoting *Rita,* 551 U.S. at 350); *see also Gall,* 552 U.S. at 46 n.2. (noting that not all Guidelines are tied to empirical evidence). Consequently, the Guidelines that are not based on empirical evidence are a less reliable appraisal of a fair sentence. *See Kimbrough,* 552 U.S. at 109-110.

Both for policy reasons and because Congress had enacted mandatory minimum sentences, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for drug crimes. Fifteen-Year Assessment at 15, 72-73; *Kimbrough,* 552 U.S. at 96. Instead, the Commission attempted "to accommodate and, to the extent possible, rationalize mandatory minimum provisions established by the 1986 Anti-Drug Abuse Act" by anchoring the Guidelines to the mandatory minimum sentences. United States Sentencing Commission, *Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* 17 n.58 (August 1991), accessed at www.ussc.gov/reports.htm ("Mand. Min. Rep't"). In doing so, the Commission adopted "the 1986 [Anti-Drug-Abuse] Act's weight-driven scheme." *Kimbrough,* 552 U.S. at 96; *see Chapman v. United States,* 500 U.S. 453, 461 (1991) (stating that the mandatory minimum

statutes adopted a "market-oriented" approach, creating a penalty scheme intended to

punish large-volume drug traffickers severely). Accordingly, the Guidelines ranges for drug

trafficking offenses are driven by the quantity of drugs, and keyed to statutory mandatory

minimum sentences based on weight. *Gall*, 552 U.S. at 46 & n.2; *Neal v. United States,*

*516 U.S. 284, 291-92 (1996)* (noting that the Commission developed Guidelines to parallel

the mandatory minimum sentences set out in 21 U.S.C. § 841(b)(1)); U.S.S.G. § 2D1.1,

comment., n. 10 ("The Commission has used the sentences provided in, and equivalences

derived from, the statute (21 U.S.C. § 841(b)(1)), as the primary basis for the guideline

sentences").  Drug purity is not a factor in determining a sentence with respect to most

drugs.  See U.S.S.G. § 2D1.1 (c), comment. n.A (basing quantity on the entire weight of

a mixture).  "The 1986 [Anti-Drug Abuse] Act uses the weight of the drugs involved in the

offense as the sole proxy to identify 'major' and 'serious' dealers." *Kimbrough*, 552 U.S.

at 95.  The Commission notes that:

> For those convicted of drug trafficking under this section, one offense-related
> factor, and only one, is determinative of whether the mandatory minimum
> applies:  the weight of the drug or drug mixture.  Any other sentence
> individualizing factors that might pertain in a case are irrelevant as far as the
> statute is concerned.  Thus, for example, whether the defendant was a
> peripheral participant or the drug ring's kingpin, whether the defendant used
> a weapon, whether the defendant accepted responsibility or, on the other
> hand, obstructed justice, have no bearing on the mandatory minimum to
> which each defendant is exposed.

Mand. Min. Rep't at 26.  The Commission's adoption of the quantity-based approach has

"had the effect of increasing prison terms far above what had been typical in past practice,

an in many cases above the level required by the literal terms of the mandatory minimum

statutes."  Fifteen Year Rep't at 50.

However, the Guidelines' treatment of methamphetamine, amphetamine, PCP and

Oxycodone does not follow the gross-weight method or market-oriented approach of

calculating the quantity of all other controlled substances.  *See Chapman*, 500 U.S. at 462-63; U.S.S.G. § 2d1.1(c), comment., n.B.    At the inception of the Guidelines, there was no mandatory minimum sentence for methamphetamine; methamphetamine offenses were included under the drug equivalency tables and had an initial equivalency equal to twice that of powder cocaine and .4 gram of heroin.    United States Sentencing Commission, Methamphetamine: Final Report (November 1999), accessed at www.ussc.gov/reports.htm ("Meth. Rep't") at 7.

Congress first established mandatory minimum sentences for methamphetamine trafficking offenses in the Anti-Drug Abuse Act of 1988.  *Id.* at 8.  Congress set two alternative measures for mandatory minimum sentences at five and ten years, triggered by quantities of both the pure drug and a mixture, instead of following the market-driven quantity approach that did not distinguish between pure or adulterated forms of a drug. *See id.* at 7-8.  The weight of a mixture that triggered each mandatory minimum was ten times the weight of the pure substance that triggered the mandatory minimum sentence. *Id.* at 8 (noting that "[t]he effect of this 10-to-1 mixture/pure substance ratio is that, under a literal application of the alternative penalty thresholds, the weight of the pure substance will control the statutory penalty whenever the purity of a methamphetamine mixture exceeds ten percent"); U.S.S.G. § 2D1.1(c) (i.e., it will take a quantity of a mixture that is ten times the quantity of actual methamphetamine to result in the same base offense level).  Under the Guidelines, the alternative quantities of methamphetamine-actual and methamphetamine-mixture required for each base offense level in the Drug Quantity Table roughly correspond to the 10:1 ratio codified by Congress in the mandatory minimum penalty provisions applicable to methamphetamine offenses.  *Compare* 21 U.S.C. § 841(b) (1)(A)(viii) & § 841(b) (1)(B)(viii) with U.S.S.G. § 2D1.1(c) (4) & (7) (Level 32 corresponds

to the quantity that triggers a ten-year mandatory minimum and level 26 corresponds to a five-year mandatory minimum sentence). "In effect, Congress's mandatory minimum designations in the 1988 Act translated into guideline changes that ascribed to methamphetamine a potency approximately 2.5 times that of the former law." Meth. Rep't at 8.

Over the years, Congress has issued other directives to the Commission to punish methamphetamine offenses more harshly. *See, e.g. Guidelines Manual*, App. C, amend. 555 (adding enhancements), 558 (amending Guidelines to ensure manufacture of methamphetamine is a significant violation), and 608 (directing commission to amend Guidelines to increase penalties if offense involved risk of harm to human life or the environment). In 1996, Congress explicitly instructed the Commission to review and amend the methamphetamine Guidelines to increase punishment for methamphetamine offenses. Meth. Rep't at 9. In response, the Commission added several enhancements and lowered the quantities of a mixture that corresponded to each offense level by half, leaving unchanged the quantities of actual methamphetamine that corresponded to each quantity level. *Id.* (noting that the amendment "changed the guideline quantity ratio between methamphetamine mixtures and actual methamphetamine from 10-to-1 to 5-to-1, which effectively means that the weight of the actual methamphetamine in a mixture now will yield a higher penalty than the weight of the mixture whenever the mixture's purity exceeds 20 percent (instead of 10 percent under the former guideline standard)." In 1998, Congress "stiffened the mandatory minimums for methamphetamine trafficking offenses by cutting in half the quantities of methamphetamine mixture and actual methamphetamine

necessary to trigger the five-and ten-year mandatory minimums.[2] *Id.* at 12, & n.35 (noting

that the Commission's action in response to the 1996 legislation had the effect of

conforming the guidelines for meth-mix to the newly enacted Mandatory Minimum). In its

Report to Congress in 1999, the Commission stated:

> At the pre-1997 amendment levels, it required 10 times the amount
> of meth-mix to achieve a comparable sentence to meth-actual. Under this
> structure, it is assumed that meth-mix is one-tenth the purity of meth-actual.
> After the 1997 amendment, it required only five times the amount of
> meth-mix to achieve a sentence comparable to meth-actual. This translates
> to an assumption that meth-mix is now one-fifth the purity of meth-actual or,
> stated in another manner, 20 percent pure.

*Id.* at 18 n. 49. The Guidelines require that the offense level be determined by either the

entire weight of the mixture or the weight of the actual methamphetamine, "whichever is

greater." U.S.S.G. § 2D1.1(c), comment., n.B; *United States v. Nevarez-Espino*, 471 F.3d

926, 927 (8th Cir. 2006). Determination of the quantity of the "pure" methamphetamine

in a mixture requires laboratory analysis to determine the purity of the drug. Meth. Rep't

at 15; *United States v. Houston*, 338 F.3d 876, 878-79 (8th Cir. 2003).

### B. Analysis

#### 1. Initial Guidelines Calculation

The court adopts the findings in the PSR. Ortega's base offense level under the

Guidelines is 24. See U.S.S.G. § 2G2.2(a)(1). The court finds a downward adjustment for

acceptance of responsibility is warranted and Ortega's resulting offense level is 21. At

---

[2]Under the Act, the 5-year mandatory minimum is triggered if the offense involves 5 grams or more of methamphetamine-actual or 50 grams or more of methamphetamine-mixture and the 10-year mandatory minimum is triggered if the offense involves 50 grams or more of methamphetamine-actual or 500 grams or more of methamphetamine-mixture. 21 U.S.C. § 841(b)(1)(A)(viii).

criminal history category IV, Ortega's recommended sentencing range under the Guidelines is 57 to 71 months. No Guidelines departure is at issue.

## 2. 18 U.S.C. § 3553(a) Factors

Ortega moves for an outside-Guidelines sentence by reason of the anomaly created by the mixture/actual distinction in the Guidelines with respect to methamphetamine. The Guidelines' commentary directs the court to apply the offense level determined by the weight of the pure methamphetamine in the mixture or substance if doing so would result in a higher offense level. Because the Guidelines require application of the greater of the two calculations, the actual/mixture distinction does not affect the defendant's Guidelines sentencing calculation. However, the court finds it is appropriate to consider the substantial disparity between the penalties for pure methamphetamine as opposed to a mixture in fashioning a sentence under Section 3553(a). In consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), the court finds that a sentence of forty-two months, followed by a term of supervised release of three years is sufficient, but not greater than necessary, to accomplish the goals of sentencing in this case.

In making this determination, the court has considered the nature of the offense and the circumstances of the crime and notes that trafficking in methamphetamine is a serious crime. Methamphetamine is highly addictive, is associated with gangs, violence and guns, and is cheap and easy to distribute. Distribution of methamphetamine presents similar dangers to society as the distribution of other drugs, and may present additional harm because of the corresponding risks of injury, toxic exposure, and explosion associated with its manufacture. The history of legislative enactments in this area reflects Congressional concern with these dangers, based in part on the ease with which methamphetamine could

be manufactured and the dangers presented by such manufacture. Later enactments limiting the availability of precursor chemicals have ameliorated those concerns to some extent.

This case involves distribution of small quantities of a methamphetamine mixture. The offense did not involve weapons or violence. Law enforcement officers employed a cooperating individual to make a controlled buy of methamphetamine from the defendant. On two occasions, the defendant sold what were essentially user quantities of a mixture of approximately 40% purity to the cooperating individual. In this scenario, the cooperating individual is presumably a user or consumer, at the lowest level of the distribution chain and the defendant is immediately above him. If calculated under the Guidelines for the entire weight of the mixture of methamphetamine, 12.6 grams, the defendant would have a base offense level of 18, a total offense level after deducting for acceptance of responsibility of 15, and a sentencing range of 30 to 37 months.

The court has considered the Sentencing Guidelines, but, because they were established pursuant to Congressional directives rather than by operation of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would empirically-grounded Guidelines. The Guidelines for methamphetamine crimes were anchored to mandatory minimum sentences, not based on empirical study. The Commission responded to Congressional directives of increasing severity over the years, greatly increasing the sentences for methamphetamine offenses. The structure of the mandatory minimum statute with respect to methamphetamine reflects the market reality that drugs are "cut" with other substances as they move through the supply chain. The sale of a drug with a higher purity is indicative of a higher position in the supply-chain.

However, the methamphetamine-trafficking climate has changed considerably since the 10:1 ratio was first established in 1988. When the court is presented with a case that does not correspond to the presumptive 10:1 Guidelines ratio, a variance from the Guidelines range is justified to account for the fact that the Guidelines sentence does not reflect the reality of the defendant's position in a drug-distribution hierarchy.

The Guidelines' quantity-driven, "market-oriented" approach is not a proxy for culpability in every case, nor does it always correlate to the purposes of sentencing under 18 U.S.C. § 3553(a). The two-tiered actual/mixture approach adopted for methamphetamine, amphetamine, PCP, and Oxycodone is only an accurate measure of culpability when it corresponds to a defendant's position in the typical hierarchy that characterizes most drug conspiracies. Where the defendant falls in this hierarchy is an important factor in the court's assessment of a defendant's ultimate culpability. The Guidelines' quantity-based system was designed to punish bigger distributors more harshly, but that result cannot be achieved when the presumptive purity assigned under the Guidelines' scheme does not correlate to the actual purity of the drug being distributed and does not reflect the reality of the market for that drug.

Here, the defendant was, at most, a street-level distributor, dealing in drugs of the same purity as most methamphetamine sold on the street. To punish him as harshly as an upper-level distributor because of a presumptive ten-to-one ratio does not reflect his position in the hierarchy nor will it promote respect for the law. The ratio illogically skews sentences for "average" defendants to the upper end of the sentencing spectrum, blurring the distinctions between high and low level distributors in a hierarchy. Ortega is close to the bottom of the hierarchy, just above a user, and his sentence should reflect that fact.

An outside-the-Guidelines sentence will respect the distinction between Ortega's culpability and the far greater culpability of a higher-level dealer who deals "Ice" or close to pure methamphetamine.

The court has also considered the need to avoid unwarranted sentencing disparities. The information that the street purity of most methamphetamine is now 40%-50%, together with the lack of evidence that Ortega was a significant player in a drug distribution network and the relatively small quantity of methamphetamine that he distributed, necessitates that Ortega should be sentenced outside the Guidelines. The court finds that a sentence of forty-two months followed by three years of supervised release is in line with the sentences of other low-level drug-distribution conspirators with similar levels of culpability.

The court finds this sentence satisfies the general purposes of sentencing, including the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. The longest sentence Ortega has received in the past is five months. This significantly longer sentence will deter him and others from engaging in similar conduct. The deterrent effect of any further incarceration would be of marginal value. The court's imposition of a three-year period of supervised release that includes stringent conditions of supervision, continued participation in a drug-abuse program and random drug tests, is sufficient to protect the public from further crimes. Moreover, the court has the authority to incarcerate Ortega in the future should he fail to comply with the terms of supervised release.

## III. CONCLUSION

The court finds that to sentence this defendant to the term recommended under the Guidelines would violate the Sentencing Reform Act's "overarching" instruction that the

court impose a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing. For the reasons stated above, the court finds defendant Juan Ortega should be sentenced to forty-two months, followed by three years of supervised release. A Judgment of Conviction in conformity with this Sentencing Memorandum will issue this date.

DATED this 17th day of May, 2010.

BY THE COURT:


s/ Joseph F. Bataillon
Chief District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.